Jeremiah M. Hudson, ISB No. 8364
Jennifer Hanway, ISB No. 9921
FISHER & HUDSON, PLLC
1109 W. Main St., Ste. 600
Boise, ID 83702
Telephone: (208) 345-7000
Facsimile: (208) 514-1900
jeremiah@fisherhudson.com
jennifer@fisherhudson.com
service@fisherhudson.com

Attorneys for Plaintiff John Doe #1

William Young, ISB No. 9415
Schofield and Young PLLC
1109 W. Main Street, Suite 600
Boise, ID 83702
E-file: e-file@youridattorney.com
William@youridattorney.com
Telephone: (208) 344-0128

Attorneys for Plaintiff John Doe #2

Dean C. Sorensen, ISB No. 5931
SORENSEN LAW, PLLC
401 West Front Street, Suite 302
Boise, Idaho 83702-5122
Telephone: (208) 922-6972
sorensen@cssklaw.com

Attorneys for Plaintiff John Doe #3

Michael Bartlett, ISB No. 5496
BARTLETT LAW PLLC
1002 W. Franklin St.
Boise, Idaho 83702
Telephone: (208) 629-2311
Facsimile: (208) 629-2460
michael@bartlettdefense.com

Attorneys for Plaintiff Jane Roe/John Doe #4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

JOHN DOE #1, JOHN DOE #2, JOHN DOE #3, JANE ROE on behalf of her minor child, JOHN DOE #4,

Plaintiffs,

v.

WENDY JOHNSON, in her individual capacity, NICK SMITH, in his individual capacity, CHAD WRIGHT, in his individual capacity, and SHELLEY BONDS, in her individual capacity, JASON HUTCHINSON, in his individual capacity,

Defendants.

Case No.: 1:26-cv-00752

COMPLAINT AND DEMAND FOR INJUNCTIVE RELIEF AND JURY TRIAL

Plaintiffs John Doe #1, John Doe #2, John Doe #3, and Jane Roe on behalf of John Doe #4 allege as follows:

**SUMMARY AND NATURE OF THE ACTION**

1. This action challenges Plaintiffs' disciplinary exclusion from Timberline High School without any meaningful opportunities to answer the cases against them. Plaintiffs seek relief for the suspensions, removal and placement decisions, and their continuing consequences.

2. Plaintiffs allege that Defendants imposed an initial 2 school-day disciplinary suspension without providing Plaintiffs with an opportunity to be heard. At the end of the first suspension, it imposed an additional 5 school-day suspension without ever having provided Plaintiffs with any opportunity to be heard. At the end of the second suspension, it imposed an additional 10 school-day suspension without ever having provided Plaintiffs with an opportunity to be hearing.

3. Throughout the entirety of Plaintiffs' 17 school-day suspension, top District officials made multiple public statements condemning Plaintiffs alleged behavior, blaming Plaintiffs for the negative publicity and threats to the school, and expressly promising that Plaintiffs would be punished for their conduct before ever providing Plaintiffs with an opportunity to be heard.

4. Near the end of Plaintiff's 17 school-day suspension, Plaintiffs were each informed that Timberline's Principal, Chad Wright, was recommending an additional punishment—that each Plaintiff be removed from Timberline High School and placed in either Boise Alternative to Suspension and Expulsion school or Boise Online School for either the remainder of the semester or the remainder of the school year. They were informed that hearings would be held between two and three school days after notices were sent to each Plaintiff. The following day, hearing packets

were sent to Plaintiffs that contained the evidence against them, leaving John Doe #3 with less than one full school day and John Doe #1, John Doe #2, and John Doe #4 with only one full school day to review the evidence, gather witnesses, and strategize and attend the hearing. The panels consisted of BSD employees whose bosses had publicly expressed condemnation of Plaintiffs in the prior weeks and had promised the public that Plaintiffs would be punished.

5. John Doe #3 attended his hearing less than one school day after receiving his hearing packet and less than two school days after receiving notice of the hearing. John Doe #1, John Doe #2, and John Doe #4 informed the District that they would not be able to adequately prepare for and attend a hearing on that short of notice. The District informed them that they could reschedule their hearings for the following week provided that they had to occur before Thursday, November 5, 2026. That date was picked because the District intended to extend Plaintiffs' suspensions for an additional 5-days to ensure that Plaintiffs would not be able to return to school prior to the hearing. After realizing that the District would be continuing to violate Plaintiffs' due process rights with an additional suspension, it requested that John Doe #1, John Doe #2, and John Doe #4 accept an offer to accept in-home tutoring from the District and agree not to return to Timberline when their suspension expired before their rescheduled hearing. John Doe #2's hearing had already been rescheduled to November 4, and John Doe #1 was awaiting a comparable date to be proposed by the District. John Doe #4 accepted the District's offer for in-home tutoring and agreed not to return to Timberline before his hearing. John Doe #2 and John Doe #1 refused the District's offer. John Doe #4's hearing was set for November 3, 2026, but after accepting the in-home tutoring offer was abruptly cancelled by the District on October 29, 2026, and to date it has not been reset. Approximately 37 hours before John Doe #1 and John Doe #2 were to return to Timberline from their 17 school-day suspension, the District sent them notices that the hearing

would be occurring the first morning following their suspensions at 8:00 a.m. and 8:30 a.m. They informed the District that they did not have time to strategize or prepare, or to gather witnesses to testify, and, accordingly they would not attend. They planned to attend school that morning.

6. Three days after John Doe #3's hearing, the District ordered that John Doe #3 attend Boise Online School through the remainder of the Semester. Just over two hours after the District's hearings for John Doe #1 and John Doe #2, the District ordered John Doe #1 to attend Boise Online School through graduation at the end of the 2026–2027 school year and John Doe #2 to attend Boise Online School through the end of the semester. The Panels each stated that it was not Plaintiffs' communications in the private chat that led to their removal from Timberline, but the public's reaction to those communications and the disruption it caused.

## JURISDICTION AND VENUE

7. This action arises under the Fourteenth Amendment and 42 U.S.C. § 1983. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

8. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this action occurred in Boise, Ada County, Idaho, within this District. Defendants exercised public-school authority in Idaho, and their relevant acts and omissions occurred under color of Idaho law.

## PARTIES

9. Plaintiff John Doe #1 ("JD1") is eighteen years old and attended Timberline High School before the challenged actions. He brings this action on his own behalf as an adult and is subject to an October 30, 2026, order removing him from Timberline and placing him in Boise Online School through the end of the 2026-2027 school year.

10. Plaintiff John Doe #2 ("JD2") is eighteen years old and attended Timberline High School before the challenged actions. He brings this action on his own behalf as an adult and is subject to an October 30, 2026, order removing him from Timberline and placing him in Boise Online School order through the end of Semester 1 of the 2026-2027 school year.

11. Plaintiff John Doe #3 ("JD3") is currently eighteen years old, and brings this action on his own behalf as an adult, though he was seventeen when the events forming the basis of this action occurred. He attended Timberline High School before the challenged actions. JD3 is subject to an October 29, 2026, order removing him from Timberline and placing him in Boise Online School placement through the end of Semester 1 of the 2026-2027 school year.

12. Plaintiff Jane Roe is the legal guardian of John Doe #4 ("JD4") and sues on his behalf. John Doe #4 attended Timberline High School before the challenged actions and accepted the District's temporary tutoring proposal pending a placement hearing.

13. Defendant Wendy Johnson ("Superintendent Johnson") is the Superintendent of the District. She personally imposed or directed the discipline of Plaintiffs. She is sued in her individual capacity for her own acts and omissions, not merely because she held a supervisory position.

14. Defendant Nick Smith ("Deputy Superintendent Smith") is the Deputy Intendent of the District. He personally imposed or directed the discipline of Plaintiffs. He is sued in his individual capacity for his own acts and omissions, not merely because he held a supervisory position.

15. Defendant Chad Wright ("Principal Wright") is Principal of Timberline High School. He personally imposed or directed the two-school-day and five-school-day suspension and

signed the recommendation for a change of school location. He is sued in his individual capacity for his own acts and omissions, not merely because he held a supervisory position.

16. Defendant Shelley Bonds ("Area Director Bonds") is the Timberline Area Director for the District. She personally approved and communicated the additional ten-school-day suspension in an October 13 letter. She is sued in her individual capacity for her own acts and omissions.

17. Defendant Jason Hutchinson ("Area Director Hutchinson") is the Borah Area Director for the District. He personally oversaw the change of school hearings for JD1, JD2, and JD3. He is sued in his individual capacity for his own acts and omissions.

## FACTUAL ALLEGATIONS

18. Before the challenged exclusions, Plaintiffs attended Timberline High School, located in the Boise School District (the "District") and possessed legitimate entitlements to public education, subject to lawfully imposed discipline.

19. On Wednesday, September 30, 2026, some of the Timberline football players saw one of their teammates, referred to with a pseudonym, James Poe, with a girl he had been dating on and off for months, referred to as Jane Moe. The teammates were extremely concerned for James Poe because Jane Moe had been harassing him including telling him and another girl he was dating to kill themselves, vandalizing his property, propositioning his teammates, sending a voicemail to his mom pretending to be the CDC and that James Poe needed to be tested for STD's, as well as sending him threatening messages. The teammates believed these actions by Jane Moe were negatively contributing to James Poe's mental state and were concerned for him.

20. Later that evening around 10:00 P.M., several boys, including Plaintiffs, participated in a private group chat on Snapchat expressing their concerns and encouraging James Poe to remove himself from the toxic relationship.

21. The portions released publicly of the private, "Gameday lunch" chat occurred as follows:

> JD1: "I'm telling you the honest truth [redacted] this is embarrassing and you need to figure it out or shit will keep getting worse. I promise you ur mental health and life would be better without her. Who gives a shit if she crying to you. She doing that always when bbc is inside her while U are apologizing for not reason,"
>
> James Poe: "Bro you guys are acting like she fucks the whole 208, She doesn't even have that many bodies."
>
> JD1: -two laughing/crying emoji faces-
>
> (Several others posted about what to have for lunch)
>
> JD1: "She would definitely let us all fuck her. U think Cornell was bad just wait for US"
>
> JD2: "Drop her bitch ugly ass"
>
> JD1: "Let's hang her from a high post and let the birds pick at her brains for days."
>
> JD2: "Dumb slut"
>
> JD1: "Let's make her life hell"
>
> JD3: "fuck yeah"
>
> JD1: Since she made Caldwells hell"
>
> JD2: "The conversation for if she deserves to die is there"
>
> JD3: "I like that shit"
>
> JD2: "And that says a lot"
>
> -Unidentified image-

> Teammate 1: “Ok cmon bro”
>
> JD1: “That’s fucking great” -laughing/crying emojis-
>
> Teammate 2: “Yall gotta chill”
>
> Teammate 3: “Yeah We don’t understand”
>
> JD1: “Her and [redacted name] are just whores bro and they definitely influence each other to just get fucked non stop”
>
> JD4: “She did terrible things I don’t even care”
>
> James Poe: “Ok bro I’ll give yall the full truth on why I think it’s hard for me to let go.”

22. None of the messages related to sexual assault. JD1 alleges that his sexually derogatory remarks were intended as crude commentary about Moe’s perceived cheating on James Poe by explaining to Poe that Moe would be willing to have consensual sexual relationships with many individuals, including Doe’s teammates and friends—not advocacy of sexual assault.

23. Plaintiffs did not intend for their statements to be viewed by Jane Moe or be shared outside of the group participants.

24. There was no intention behind Plaintiffs’ words other than to express the seriousness of their concerns with Jane Moe’s behavior and its impact on James Poe. Plaintiffs expressly deny any intent to carry out violence.

25. Plaintiffs contend that the conversation reflected friends criticizing James Poe’s continued relationship with Jane Moe and reacting to his reports of substantial mistreatment by Moe. The Plaintiffs do not deny that their private language with their friend was distasteful.

26. On Thursday, October 1, 2026, Jane Moe gained access to James Poe’s phone and the private group chat and took screenshots. Jane Moe then threatened Plaintiffs and the other players that she would go public with the screenshots.

27. On Friday, October 2, 2026, Jane Moe posted the screenshots on social media with the full names of the alleged participants. She also shared them with other Timberline students, one of whom sent them to the Meridian Barstool Instagram account, which reposted them along with hateful comments, images, and videos about the Timberline football players and their parents.

28. Also on Friday, October 2, Jane Moe shared the screenshots with Assistant Principal Kristen Duskey at Timberline, without sharing the surrounding context. Prior to communicating with Plaintiffs or their parents, Assistant Principal Duskey contacted the police.

29. No one from the school contacted Plaintiffs or their parents that Friday.

30. On Saturday, October 3, 2026, a student who was not associated with the issue, started a Change.org petition titled "Demand justice and accountability at Timberline High School," stating that football players "called for a female student to be raped and killed," and demanding disciplinary consequences including removal from the football team and expulsion from Timberline. That petition included the first and last names of Plaintiffs inciting retaliation across the community. The petition received over 16,000 signatures.

31. The screenshots generated widespread public attention and accusations that participants advocated sexual assault and extreme violence. Plaintiffs dispute those characterizations and allege that individual attribution, context, and intent required meaningful consideration before discipline was imposed.

32. Media coverage in the following days amplified those accusations. CBS2 published an article titled "Timberline High School class walk out after violent threats made to female student" and quoted a student saying that the incident "brought a lot of shame to our school to know we have the kind of people here that will, you know, commit those acts of violence against others."

33. Idaho News 6 reporter Kalkidan Meyer wrote: “The investigation follows alleged Snapchat messages involving Timberline football players that called for a female student to be raped and killed.” Meyer also reported that District officials described the initially reported material as “a horrific screenshot.”

34. Idaho Statesman reporter Sally Krutzig described “attention — and fury — from the broader community” and wrote that screenshots “appeared to show members of the Timberline football team sending violent messages on Snapchat about raping and killing a female student.”

35. On Saturday, October 3, 2026, the District made the first of many public comments describing the material as “highly inappropriate and concerning social media posts.”

36. Also on Saturday, October 3, at 9:57 a.m., Ian Smart, Timberline’s head football coach and also a P.E. teacher for some of the Plaintiffs, posted to the team’s SportsYou app “As I'm sure all are aware, some of our players made disgraceful comments about another student. At this time, I am working with our school administration to determine what the consequences for these student's actions will be moving forward.” He added that he was “incredibly disappointed by our players actions” and that “the actions of these players have brought shame to all of us.”

37. On Sunday, October 4, Principal Wright, Area Director Bonds, and Superintendent Johnson issued a statement that described “disturbing social media posts” and declared that “there is zero tolerance for the type of behavior and language attributed to any member of our school community.” Their statement continued: “This is not who we are and we will not be defined by the actions of a few”—referring to Plaintiffs.

38. The same officials told school families and staff that, “given the explicit content in the posts, emotions like anger, fear and sorrow are natural reactions.” Plaintiffs allege that these

statements publicly framed the controversy before the commencement of an investigation into Plaintiffs' conduct.

39. The combination of the frenzy of social media posts and online petition caused a public uproar resulting in disruption to the school and a detrimental impact on Plaintiffs who had not yet even been questioned by the school, investigated, or in any way been determined guilty of any accusations.

40. During the afternoon and evening of Sunday October 4, 2026, Principal Wright and Assistant Principal Duskey called the parents of each of the Plaintiffs and notified them that for the safety of all involved parties they wanted the Plaintiffs to stay home on Monday October 5 and Tuesday October 6 under an extreme absence while police continued their investigation. JD1 was informed during this call that those two days would be counted toward any future suspension that may be imposed.

41. The school did not request to hear from Plaintiffs or their parents to try to better understand the situation at that time.

42. District Policy 3273 "In-School Detention, Suspension and Expulsion" allows for removal before a hearing only in an emergency, followed by an informal hearing as soon as the emergency ends.

43. No written notice, hearing, or emergency finding was issued for those two days, and they were coded by the District as "Extraordinary" absences.

44. On Monday October 5th and Tuesday October 6th, 2026, alleged participants in the chat, excluding Plaintiffs, were interviewed by police on campus.

45. On the evening of Tuesday, October 6, 2026, Principal Wright sent Plaintiffs and two additional students suspension letters, via email, imposing five days of suspension, through October 14, based on violation of school policy. The letter is mistakenly dated October 26.

46. The October 6 letter stated that the students had been provided an informal opportunity to challenge the reasons for the suspension and provide an explanation. This was inaccurate. The Plaintiffs were never given an opportunity to challenge the suspension nor provide an explanation.

47. Later on the evening of Tuesday October 6, Plaintiffs received a Notice of Title IX Allegation and Investigation, which included a No Contact Order barring contact with Jane Moe, from Title IX Coordinator Robb Thompson.

48. The Title IX notice indicated that Plaintiffs were presumed not responsible and stated that police had asked the District to defer interviews of Plaintiffs: “You are not being asked through this letter to provide a statement or submit to an interview at this time.”

49. In the same evening, one District official was communicating to Plaintiffs that they had been heard while another District official was telling them that the District was not yet asking for their statements.

50. The Title IX investigation was subsequently dropped for JD3 on October 15th. The Title IX investigation is ongoing for the remaining Plaintiffs.

51. On Friday, October 9, 2026, Principal Wright, Area Director Bonds, and Superintendent Johnson described “disturbing threats of violence,” stated that “the individuals will be held accountable for their actions,” and referred to the “actions and poor choices of individual students.”

52. They also acknowledged "negative, threatening, and highly emotional thoughts expressed throughout the community either on social media, local and national media, as well as messages and phone calls to school and district staff." Explaining cancellation of the football game, they stated that "we couldn't risk the safety of our student athletes or their families and friends by holding an event of this size at a public venue."

53. Also on October 9th, Katie Cronin, the school psychologist at Timberline sent emails to Plaintiffs and their parents requesting to "conduct the threat assessment interview" early the following week. That email did not clarify the intent of the assessment or what would be discussed.

54. On Friday October 9th, Robb Thompson sent Plaintiffs an Updated Notice of Allegation and Investigation, narrowing the allegations against them.

55. The notice to JD4 asserted that the conduct occurred "at or near Timberline High School" despite it taking place off campus at night. The notice again stated that JD4 is "presumed not responsible" until the end of the grievance process and that discipline up to "alternative placement" could follow only "[i]f substantiated." It also stated that Jill Holinka, the independent investigator assigned, would contact him to schedule an interview. To date, no such contact has been made with JD4 or his parents.

56. JD1's notice was substantially similar asserting that the conduct occurred "at or near Timberline High School" and that he was "presumed not responsible." The initial notice sent to JD1 and his family included JD4's name in the salutation line and an amended version was subsequently re-sent.

57. On Monday, October 12, 2026, the Board of Trustees discussed the controversy, and expressed support for the alleged victim, praise for the District employees' handing of it, and

implicit condemnations of Plaintiffs' alleged conduct, among other things. At the meeting, Area Director Bonds described the messages to the Board as "incredibly horrific."

58. Area Director Bonds told the Board that police interviews had concluded the preceding Wednesday, and the District had been "given the all clear to begin investigating on our own."

59. On Monday, October 12 and Tuesday, October 13, 2026, JD2 and JD3 participated in the threat assessment where they were asked to answer detailed questions about the incident under the guise it was necessary to ensure they were not a threat to return to school on Thursday, October 15, the date communicated in the October 6 suspension notifications.

60. James Poe was also interviewed on October 12 by School Psychologist Katie Cronin. According to School Psychologist Cronin's notes, his friends were trying to support him, "The stuff she did caused the conversation to start." He reported that Jane Moe had substantially mistreated him following their breakup, including her use of a fake Snapchat account, creating AI-generated images suggesting positive STD tests, making calls to him and his mother from fake numbers, including "sending a voicemail to [James Poe's] mom saying it was the CDC" and that he needed STD testing. Jane Moe had also sent him numerous harassing messages including telling him "U gotta F*ing kys [kill yourself]".

61. James Poe explained about the messages at the center of the controversy: "The kids were trying to they thought she wasn't the greatest role model for me and they were trying to support me."

62. In an October 13, 2026, follow-up call, James Poe's mother reported that his friends asked why he was spending time with Jane Moe "after all she had done to him," and that texting followed their in-person conversation.

63. School Psychologist Cronin's notes state: "He does not think his friends really meant anything they said about hurting her, raping, or killing." They record that it was "a private group chat" that Jane Moe "was not supposed to see." James Poe reported that Jane Moe posted screenshots on TikTok and said: "It wasn't immediate."

64. On Tuesday, October 13, School Psychologist Cronin and Counselor Beverly Glouser interviewed Jane Moe. She reported that James Poe showed her the conversation and she took screenshots of the messages she considered "really bad." She stated she shared screenshots with friends, sent them to Meridian Barstool, and posted them on TikTok with names blacked out.

65. The notes record her explanation that participants made the statements "because they don't like her and didn't like that they got back together" and that "[h]is friends thought she mistreated him." She was not aware of Plaintiffs posting anything about her online.

66. Jane Moe indicated that she had "never really talked to" Plaintiffs, that she had no previous contact with the Plaintiffs through social media and that no one had been harassing her.

67. Asked, "Moving forward, what would you like to see happen? What do you feel is an appropriate consequence?", Jane Moe requested suspension for Plaintiffs: "She wants to see them suspended for 15 days." This establishes that Jane Moe did not view Plaintiffs' conduct as being worthy of permanent or prolonged exclusion from Timberline High School.

68. Also on Tuesday, October 13, District Board President Dave Wagers, Vice President Debbie Donovan, Trustees Paul Bennion, Krista Hasler, Andy Hawes, Alejandro Necochea, and Elizabeth Reiman, Superintendent Wendy Johnson, and Deputy Superintendent Nick Smith issued an open letter describing Jane Moe as "the target of the disturbing threats of violence that brought us to this point."

69. The letter described "a private string of vulgar and violent text messages" and declared: "Those responsible are being investigated and disciplined." Although acknowledging a responsibility to "remain at some distance to avoid conflicts with our role in adjudicating student disciplinary actions," its signatories stated: "The process, although not as quickly or as ruthlessly as some on social media would like, is working."

70. The letter described "a highly public and horrific situation" and condemned "the anger, callousness, and lack of respect for another human being conveyed in the online messages." These statements publicly condemned Plaintiffs' otherwise private messages between teammates while disciplinary proceedings remained pending and the District still had not heard from Plaintiffs.

71. On October 13, 2026, at about 3:50 p.m. Jane Roe left a voicemail for School Psychologist Cronin asking to understand what the threat assessment would cover, that counsel had advised against participating and that she wanted to ensure that would not affect JD4's scheduled return on October 15 before making a decision.

72. Jane Roe followed up that voicemail with an email at 4:10 p.m. to School Psychologist Cronin asking if the interview was "a requirement for JD4 to return to school this Thursday." Thirty minutes later, and shortly after JD3 had completed his Threat Assessment, at 4:40 p.m. Area Director Bonds emailed a letter to Plaintiffs extending the suspension an additional 10 schooldays, beginning October 15 and ending October 29, with a return date of October 30 unless otherwise notified "as we finish our investigation."

73. Idaho Code § 33-205(6) allows the Superintendent or a designee to grant a 10-day suspension, it is unclear whether Superintendent Johnson delegated that authority to Area Director Bonds.

74. The letter sent to JD4 mistakenly stated that "JD2 may return to school on October 30".

75. At 5:41 p.m. on October 13, Principal Wright and School Psychologist Cronin left Jane Roe a voicemail offering to explain the threat assessment process and answer questions. The voicemail did not answer whether the interview was required for JD4's return, and by then the District had already extended his suspension.

76. The District's records state that the extension was "imposed to allow for completion of threat assessment and school administrative interviews/investigation."

77. On Thursday, October 15, Plaintiffs received a "Letter of Process" from Area Director Bonds, which discussed the threat assessment and stated: "Nonparticipation alone will not be treated as proof of misconduct or as an independent ground to prolong suspension" and that "an ongoing police investigation or an incomplete safety-assessment interview does not automatically extend" the suspension limits and that compulsory placement required an independent legal basis and applicable procedures.

78. The Letter of Process also committed the District to a separate Board process under Idaho Code §33-512E, with a Board investigation and determination.

79. None of the Plaintiffs have been notified that a Board investigation has taken place, and on October 28, Bonds confirmed that at least JD4 was "not the subject of any board meeting at this time."

80. That letter also stated that the Plaintiffs would be contacted about "the individual safety assessment...and identify the next decision point."

a. For JD3, this resulted in an interview with Principal Wright and Assistant Principal Duskey, where he was asked essentially the same questions as at the Threat Assessment. While

results of that interview were reportedly shared with the District, no copies have been shared with JD3.

b. For JD1, JD2, and JD4, no one ever asked that they meet with Principal Wright or an Assistant Principal.

81. On October 19, 2026, at 3:58 p.m. School Psychologist Cronin notified JD4's family of a Section 504 manifestation determination review the following afternoon, which she stated "should be done on or before the 10th day of out-of-school suspension." This review decides whether a student's conduct was caused by his disability or by the school's failure to follow his plan.

82. The notice form provided by the District allows a parent to request to reschedule the review, and at 5:15 p.m. that evening, Jane Roe did as she had never heard of the process and the family was seeking counsel.

83. District Policy 3273 requires that discipline of students with disabilities follow Section 504.

84. The following day, on October 20, 2026, Principal Wright refused, writing that the District "cannot delay the MDR meeting beyond the 10th day." The District's attendance record shows October 20, 2026, was only the eighth day.

85. In response, Jane Roe objected in writing and asked for "the process for requesting review or a hearing." In response, Principal Wright did not address that request, answering "we plan to proceed with the MDR today, as we must."

86. Later that afternoon, Principal Wright, Assistant Principal Duskey, School Psychologist Cronin and counselor Lisa Ennis met without JD4 or his parents. Their notes indicate

that the "Parent was notified and declined", acknowledge they had no medical records or assessments and found no link to his disability.

87. That afternoon, Robb Thompson also sent JD4 and his parents a District chart promising "no indefinite exclusion based solely on interview refusal or pending police investigation."

88. On October 21, 2026, Principal Wright, Assistant Principal Duskey, School Psychologist Cronin and counselor Kim Ross completed the Plaintiffs' threat assessments. JD2 and JD3 had both provided interviews, while JD1 and JD4 declined.

89. The District's threat assessment classified each of the Plaintiffs' threat levels as "Transient," the second-lowest of four levels.

90. In reaching this conclusion for JD1 it stated that his remarks included no clear plan or means of harming the targeted student. For JD4, they found he "does not have a history of threatening behavior."

91. JD4's threat assessment recounts the private group chat involving Plaintiffs and James Poe as beginning with lunch plans and turning to support for Poe in what participants considered an unhealthy relationship. This context was omitted from the selected messages circulated publicly.

92. On October 21, 2026, JD3 and JD4 received a Change of Placement Hearing Letter stating that Principal Wright was recommending they be removed from Timberline and placed in a different educational program. For JD4 he recommended that he attend the Boise Alternative to Suspension and Expulsion School "for the remainder of the 2026/2027 school year". For JD3, he recommended transfer to Boise Online School through the end of the 2026-2027 school year, with consideration of an extension or a return to school to occur in December 2026.

a. The basis for JD4's recommendation was "Screen shots showed JD4 texting AI generated pornography. This led to school disruption."

b. No specific basis was provided for the recommendation for JD3, other than "Violation of Policy 3230, 3273, and 3275".

93. The following day, Thursday October 22, 2026, JD1 and JD2 received Change of Placement Hearing Letters stating that Principal Wright was recommending that they be placed in a different educational program. For JD1 he recommended that he attend the Boise Alternative to Suspension and Expulsion School "for the remainder of the 2026/2027 school year". For JD2, he recommended transfer to Boise Online School through the end of the 2026-2027 school year, with consideration of an extension or a return to a school location to occur in December 2026.

a. For JD1, the basis was that he reportedly stated "'She would definitely let us all fuck her – you think Cornell was bad just wait for us. 'Let's hang her from a lightpost and let the birds pick at her brain for days.' JD1 also responded with a laughing emoji to the statement: 'let's make her life hell since she made Caldwell's hell,' and is reported to have stated: 'Her and Haven are just horrors bro and the definitely influence each other to just get fucked non-stop.' This also led to school disruption."

b. The basis for JD2's recommendation was "posting in a group chat 'Drop her bitch ugly ass. Dumb slut. The conversation of if she deserves to die is there.' Which led to educational disruption at Timberline High School."

94. These notices cite disruption, not safety and came 12 days after the District's Title IX notice stated that removal from Timberline and alternative placement could follow only "[i]f substantiated" at the end of a grievance process that had not even begun.

95. The notices cite violation of District Policies 3230, 3272, 3273, and 3275 as the grounds for the change of school location recommendation.

96. Policy 3230 governs student conduct "on any school premises or at any school sponsored activity, regardless of location." Plaintiffs' statements were not made on school premises or at any school sponsored activity.

97. Policy 3272 provides for discipline for major disciplinary violations "when occurring on any school premises or at any school-sponsored activity, regardless of location." Plaintiffs' statements were not made on school premises or at any school sponsored activity.

98. Policy 3273 requires that change in placement notices state the hearing's time and place and be hand-delivered or sent by certified or registered mail.

99. The notices sent to Plaintiffs gave no time or place, arrived only by email, and referred to an "attached summary report of the investigation" that was not attached.

100. On Thursday October 22, JD3's parents received a call notifying them that the hearing was being scheduled for Monday, October 26.

101. JD4's parents also received a call on October 22 from Kara Adler at the District to set the hearing for October 26. When Jane Roe asked for additional time to prepare, she was told the next date was November 3, 2026, and that JD4's suspension would have to be extended to allow for that date.

102. Idaho Code §33-205, District Policy 3273, and the Letter of Process all provide that suspensions beyond 15 days are only permitted with a Board safety finding, which has not occurred.

103. On Friday, October 23, 2026, Ms. Adler set JD4's hearing for November 3, 2026.

104. On the afternoon October 23, Assistant Principal Duskey emailed the parents of the Plaintiffs pre-hearing packets with the District's evidence to support the recommendation for the removal from Timberline and the change of school placement.

105. This was not even one school day before the initially scheduled hearings for JD3 and JD4, and less than one school day before the initially scheduled hearings for JD1 and JD2, leaving Plaintiffs and their counsel inadequate preparation time.

106. The hearing packet included an undated, unsigned statement titled "Impact on Timberline." It alleged that a screenshot "referenced sexual violence" and that it and other screenshots containing "AI generated pornography, death and killing" were shared on social media.

107. The statement asserted: "This has disrupted the Timberline school community and learning environment in many ways." It cited additional police, crisis-team assistance, counseling demands, and staff meetings, and described students as "angry, confused, frustrated and sad." It reported requests for schedule changes, transfers, and "96 more absences during that week compared to the previous week."

108. It also cited postponed or cancelled homecoming events and concluded: "This has had a huge impact on our school community, that we have yet to recover from." The statement did not identify Plaintiffs or distinguish their individual statements from other participants' conduct, dissemination, or third-party reactions.

109. JD3 proceeded with his hearing on Monday, October 26. He attended with his parents and legal representative, presented evidence, and through counsel questioned Principal Wright. As a result, JD3 had less than one full business day with the evidence to prepare.

110. JD1 and JD2, whose hearings had been set for Tuesday, October 27, 2026, like JD4, informed the District that they could not adequately prepare on the shortened schedule. JD2's hearing was initially rescheduled for November 4, and JD1 awaited a comparable date from the District. Plaintiffs' suspensions were set to expire on October 29, and they would otherwise be able to return to Timberline on October 30.

111. Any further extension of Plaintiffs' suspension was required to be approved by the District Board. The Board had an October 29 executive session scheduled and Plaintiffs understood a further suspension extension was contemplated.

112. In anticipation that the District Board would attempt to impose an additional suspension on Plaintiffs so that they would not be able to return to Timberline before the hearing, Plaintiffs challenged further suspension without meaningful opportunities to answer the disciplinary case and provided District counsel with due-process authority.

113. On October 27, Area Director Bonds wrote to Jane Roe that the District would not be seeking an additional five-day extension and citing Jane Roe's request for additional time to prepare, offered homebound instruction while the hearing was pending. This was described as "voluntary and temporary" and not "another suspension or an implementation of the principal's recommended change of school location."

114. That same day, District counsel James Stoll relayed the same message regarding suspensions to counsel for JD1 and JD2 and proposed the same homebound instruction offer.

115. JD4 accepted the District's proposal while JD1 and JD2 declined the District's homebound instruction offer.

116. On Wednesday, October 28, 2026, counsel for JD1 disputed the District's disciplinary basis and argued that further exclusion was unwarranted. The messages were private,

off-campus speech never intended for the targeted student, and that any discipline had to be proportionate and supported by the applicable policies.

117. At 6:55 p.m. on Wednesday, October 28, District counsel sent JD1's attorney notice of a hearing at 8:00 a.m. on Friday, October 30. JD2 also received an evening notice resetting his hearing for 8:30 a.m. Friday morning.

118. The District did not consult their attorneys about scheduling conflicts. The notices described the voting panels as three certificated District staff members uninvolved in the disciplinary action and identified Area Director Jason Hutchison as nonvoting hearing officer. The voting members were not identified beforehand.

119. The notices promised "90 minutes as the base hearing timeframe, with reasonable additional time depending on the number of relevant witnesses." They recognized representation by counsel, witnesses and evidence, and cross-examination of adult adverse witnesses who appeared.

120. They requested witness identities and general subjects twenty-four hours before the hearings. For JD1, that left approximately thirteen hours (none of which were business hours) after the evening notice to supply the information. JD1 objected that the notice did not allow adequate preparation or assembly of witnesses.

121. The proposed schedule referred to "Chad", presumably Principal Wright, presenting the recommendation, but the notice separately stated: "The District's presenting witness will be Drew Lingle, and he will be available for questioning." JD1 and JD2 allege that counsel was later told Principal Wright would be out of town and unavailable.

122. On October 29, 2026, Stoll maintained that additional preparation time had been conditioned upon the tutoring arrangement being accepted. He also explained that the anticipated

November 5 timeframe had related to a Board suspension extension that the District was no longer pursuing. Plaintiffs dispute the District's conditioning of adequate preparation time on an agreement that they remain excluded from Timberline High School.

123. Without explanation, on October 29, Ms. Adler canceled JD4's November 3, 2026, hearing. Later that afternoon, Area Director Bonds confirmed his official suspension will end today," that homebound instruction "through the end of the first semester will NOT count as any suspension," and that "The discipline record will not show suspension and attendance will not reflect his absence."

124. On Thursday, October 29, JD3's panel issued an initial decision. On Friday, October 30, 2026, JD3's panel issued an Amended Written Decision of Student Placement Hearing Panel following the October 26 hearing, four days after the hearing. The voting members were Principals Meghan Wonderlich and Derek Gardner and Counselor Jenifer Ayres.

125. Pursuant to District Policy 3273, written decisions are to be issued within 3 days after the hearing.

126. JD3's panel found a "direct and material impact on the school environment" and expressly considered "the disruption to the Timberline school community arising after the conversation became known." It ordered Boise Online School through the end of the current semester, with return conditioned on academic completion, "not a separate behavioral review or discretionary disciplinary approval."

127. On October 30, JD4's family was informed by homebound teacher Julie Morgan that direct instruction could be "as little as 2 hours a week." As of November 4, 2026, JD4 has had one Google Meet session with Ms. Morgan lasting about 30 minutes, plus some text and email contact.

128. Despite Area Director Bonds' assurance that "attendance will not reflect his absence," ParentSquare notified Jane Roe that the District had marked JD4 absent on October 30 and November 2, while he was on homebound instruction.

129. Neither JD1 nor JD2 attended the October 30 hearings. They returned to Timberline after their suspensions expired, began class at 9:49 a.m., and were removed around 10:25 a.m. by a vice principal who confiscated their phones and said they had been assigned elsewhere.

130. Neither JD1, JD2, nor their attorneys had received decisions when they were removed. At 10:37 a.m., JD1's attorney contacted Stoll. Stoll responded: "The panel mad [sic] a decision for your client and Will's client to be assigned to Boise online school. The written decision will be sent shortly."

131. JD1's voting panel consisted of Principal Melanie Koch, Assistant Principal Steve Novotny, and Counselor Dayna Showalter, with Area Director Hutchison serving as Hearing Officer without a vote. It acknowledged the private, off-campus exchange and found no "proven plan, preparation, or intent to commit physical violence."

132. Nevertheless, it justified discipline by stating: "The walkout interrupted instruction; safety-related absences and withdrawals affected attendance; staff and counseling resources were diverted; and school activities and security operations were materially affected." It relied on "those concrete effects, not merely the fact that JD1's words were offensive or attracted criticism."

133. The panel acknowledged "multiple speakers, widespread circulation, public reaction, and threats by third parties" but found JD1's statements a material contributing cause. It rejected Boise Alternative to Suspension and Expulsion school and ordered Boise Online School through the school year, citing uncertainty whether a midyear return would permit "stable

educational operations." As a high school Senior, JD1 will never return to or graduate from Timberline High School.

134. JD2's voting panel consisted of Principals Nathan Dennis and Pamela Dietz and Counselor Mariah Ruth, with Area Director Hutchison serving as Hearing Officer without a vote. It credited his transient threat assessment and the absence of an established plan, preparation, weapon, or intent to carry out violence.

135. It nevertheless relied on "the actual interference with school operations, not merely the offensiveness of the language or disagreement expressed by others." It concluded that the statements' connection to "documented protest activity and school safety response" justified applying the policy "notwithstanding their private, off-campus origin."

136. JD2's panel ordered Boise Online School only through the first semester. His return required academic completion, "not a new behavioral review, further placement hearing, or discretionary disciplinary approval."

137. On information and belief, each of the above-mentioned panel members knew of the controversy and the District officials' public statements condemning Plaintiffs' and promising the community that Plaintiffs would be punished before deciding Plaintiffs' removal from Timberline and placements elsewhere.

138. Plaintiffs dispute attribution of the ensuing disruption to their private messages without adequately distinguishing individual conduct, dissemination, public reaction, and threats by third parties.

139. Plaintiffs allege that James Poe shared the conversation with someone who they never intended to see it, and that Jane Moe publicly circulated selected messages without the

surrounding context. On information and belief, neither James Poe nor Jane Moe has been investigated or subjected to discipline for disruption arising from dissemination.

140. The October 26 and October 30 removal and placement proceedings did not adjudicate appeals of the earlier suspensions. The later removal and placement hearings did not, and could not, retroactively cure the earlier exclusions without meaningful process.

141. District officials suspended Plaintiffs from October 5, 2026, through October 29, 2026. None were ever offered an opportunity to explain their actions prior to the District's determination that they had engaged in misconduct, or with regards to the decision to suspend Plaintiffs.

142. Each Plaintiff lost in-person attendance at Timberline during the 17 school-day suspensions.

143. These seniors have also lost in-person attendance at Timberline for at least the remainder of the semester for JD2 and JD3 and through the end of the school year for JD1; JD4's length of exclusion has not yet been determined, but was recommended for the remainder of the year.

144. Based on information and belief, all disciplinary actions, including each of the suspensions that make up the 17 school-days of suspension imposed on Plaintiffs, and the removal and placement hearings are included in Plaintiffs' student conduct records.

**COUNT I — PROCEDURAL DUE PROCESS**
**NO OPPORTUNITY TO BE HEARD RE SUSPENSIONS**
**42 U.S.C. § 1983**
**[DEFENDANTS WRIGHT, BONDS, AND JOHNSON]**

145. Plaintiffs incorporate the completed factual allegations above.

146. Plaintiffs had a protected property interest in continued public education. Acting under color of state law, Principal Wright personally caused a two-school-day exclusion, and the

five-school-day suspension and Area Director Bonds personally caused the ten-school-day extension of the suspension. Superintendent Johnson has the statutory authority to issue ten-school-day suspensions.

147. Plaintiffs have a liberty interest in their reputations and future opportunities that they will be deprived of by having disciplinary actions on their student records that might need to be disclosed to universities, employers, and others.

148. Plaintiffs JD1 and JD4 have a liberty interest in their reputations and future opportunities that being enrolled and receiving a diploma from the Boise Alternative to Suspension and Expulsion school would significantly damage over the course of their lives—including when they are required to disclose that fact to universities, employers, or elsewhere.

149. Defendants imposed and prolonged discipline without a constitutionally adequate opportunity to answer the charges and evidence. Each is liable only for the constitutional injury his or her own conduct caused.

150. The constitutional minimum is meaningful notice and an opportunity to answer the disciplinary case, including an explanation of the evidence when the charges are denied. Immediate removal may be justified by continuing danger or an ongoing threat of disruption, but notice and a rudimentary hearing must then follow as soon as practicable. These requirements are clearly established by *Goss v. Lopez*, 419 U.S. 565 (1975) and *K. J. by and through Johnson v. Jackson*, 127 F.4th 1239, 1245 (9th Cir. 2025), among others, before the events alleged.

151. The Ninth Circuit reaffirmed these requirements and recognized expungement as meaningful prospective relief in *K. J. by and through Johnson v. Jackson*, 127 F.4th 1239, 1245 (9th Cir. 2025).

152. The denial of process caused Plaintiffs the loss of educational access and disciplinary consequences specifically alleged above. They seek compensatory damages only for injury proven to result from the constitutional violation and nominal damages if a violation is established without proven compensable injury.

153. There was no continuing danger or ongoing threat that justified removal of Plaintiffs from school without an opportunity to be heard.

154. Plaintiffs have been irreparably harmed by Defendants' violation.

**COUNT II — PROCEDURAL DUE PROCESS**
**NO OPPORTUNITY TO BE HEARD BY DECISIONMAKER / BIAS**
**RE REMOVAL AND PLACEMENT HEARING**
**42 U.S.C. § 1983**
**[ALL DEFENDANTS]**

155. Plaintiffs incorporate the preceding paragraphs, herein.

156. Plaintiffs had a protected property interest in continued public education. Acting under color of state law, Principal Wright, Superintendent Johnson, Deputy Intendent Smith, Area Director Bonds and Area Director Hutchinson personally caused Plaintiffs to be removed from Timberline High School.

157. Plaintiffs have a liberty interest in their reputations and future opportunities that they will be deprived of by having disciplinary actions on their student records that might need to be disclosed to universities, employers, and others.

158. Plaintiffs JD1, and JD4 have a liberty interest in their reputations and future opportunities that being enrolled and receiving a diploma from the Boise School for Suspension and Expulsion school would significantly damage over the course of their lives—including when they are required to disclose that fact to universities, employers, or elsewhere.

159. While Defendants purported to provide Plaintiffs with some opportunity to be heard before those decisions were made by the above-listed Defendants, it is clear Defendants, including Principal Wright, Superintendent Johnson, Deputy Intendent Smith, Area Director Bonds, and each of the Trustees on the District's Board, had already publicly concluded and expressed that Plaintiffs had engaged in substantial misconduct.

160. Further, Principal Wright, Area Director Bonds, and Superintendent Johnson expressly and publicly implied that Plaintiffs would be severely punished for their alleged severe misconduct. Each of the panel members are subordinate to Superintendent Johnson, Deputy Superintendent Smith, and the District Trustees, and they all received the above-mentioned conclusions that Plaintiffs engaged in severe misconduct and would be held accountable for it.

161. The decision that Plaintiffs had engaged in severe misconduct and would be severely punished was conclusively determined and publicly stated by the District long before Plaintiffs' hearings. That the individual panel members put their signature on the District's previously stated decision is of no consequence. Plaintiffs were denied a meaningful opportunity to present their defenses to the allegations before the decision was made to punish them.

162. Alternatively, Superintendent Johnson, in statements made in conjunction with Principal Wright, publicly expressed her opinion that Plaintiffs had engaged in severe misconduct and would be punished accordingly, which created a bias in each of her subordinates who were subsequently on Plaintiffs' hearing panels. Employees, like each of the hearing panel members, are highly unlikely to deny the conclusions that their bosses have publicly stated were true.

163. This deficiency to the disciplinary process cannot be cured because the publicly stated conclusions from nearly every senior District official that Plaintiffs engaged in extraordinary

misconduct and that they are deserving of sanctions appropriate to the severity of their misconduct will result in a process by which Plaintiffs are unable to obtain a fair hearing.

164. Plaintiffs have been irreparably harmed by Defendants' violation.

165. Plaintiffs seek declaratory and prospective injunctive relief, expungement of sanctions and entries attributable to the violation, compensatory damages for injury proven to have resulted from that violation, and nominal damages where appropriate.

**COUNT III — PROCEDURAL DUE PROCESS**
**INSUFFICIENT HEARING PROTECTIONS – REMOVAL AND PLACEMENT HEARING**
**42 U.S.C. § 1983**
**[WRIGHT, JOHNSON, BONDS, AND HUTCHINSON]**

166. Plaintiffs incorporate the preceding paragraphs, herein.

167. Plaintiffs had a protected property interest in continued public education. Acting under color of state law, Principal Wright, Superintendent Johnson, Area Director Bonds, and Area Director Hutchinson personally caused Plaintiffs to have insufficient hearing protections related to their removal and placement hearings.

168. Plaintiffs have a liberty interest in their reputations and future opportunities that they will be deprived of by having disciplinary actions on their student records that might need to be disclosed to universities, employers, and others.

169. The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

170. Defendants deprived Plaintiffs of their property interest in their continued public education by failing to provide Plaintiffs with adequate time to prepare and respond to the evidence against them, which was used as the basis for the removal and placement orders issued to each Plaintiff.

171. Defendants deprived Plaintiffs of their liberty interest by imposing discipline, including the school change orders, which will be visible on their permanent transcripts, without a chance to have a meaningful opportunity to be heard.

172. Defendants deprived Plaintiffs of their due process rights, including a meaningful opportunity to review and answer the District's claims before long-term disciplinary removals and placements were imposed.

173. The private interests were substantial. Plaintiffs had already lost seventeen school days of in-person attendance. The proposed removals and placements threatened removal from Timberline and placement at the Boise Alternative to Suspension or Expulsion school ("BASE") or Boise Online School for the remainder of the school year. The disciplinary findings, removals, and placements also carried the student-record consequences alleged above.

174. The compressed notice and disclosure schedule created a substantial risk of erroneous decisions.

175. Preparation was material to the disputed issues. The District relied on selected messages, threat-assessment materials, and an unsigned, undated "Impact on Timberline" statement, which did not distinguish Plaintiffs' individual conduct from other participants' statements, dissemination, or third-party reactions.

176. A reasonable preparation interval would have enabled Plaintiffs and counsel to organize the evidence presented by the District, identify and seek relevant testimony concerning the conversation and its dissemination, prepare questions concerning the asserted disruption and its attribution to each Plaintiff, and address the need for, and duration of, each proposed removal and placement. A nominal opportunity to present witnesses or question an available adverse witness was of significantly diminished value without time to prepare to use it.

177. Additionally, as to JD1 and JD2, not having the ability to cross-examine Principal Wright, resulted in the opportunity not being "meaningful" given he was the decision maker regarding the proposed discipline and involved in the threat assessment determination. As such, JD1 and JD2 had the right to question him at their hearings. *Dudley v. Boise State Univ.*, 152 F.4th 981, 997-998 (9th Cir. 2025).

178. The safeguard of reasonable advanced disclosure and scheduling to allow sufficient time to prepare and present an individualized response was appropriate given Plaintiffs' substantial property and liberty interests at stake. The incremental scheduling and administrative burdens upon the District in providing such safeguards did not outweigh the value of a reliable determination before semester-long or year-long disciplinary removal and placement.

179. The challenged preparation and scheduling procedures denied JD1, JD2, and JD3 a meaningful opportunity to answer the case before the District imposed their long-term removal and placement discipline. The resulting risk of error concerned both whether discipline was warranted on the asserted grounds and whether the particular removal and placement and its duration were justified for each Plaintiff.

180. Principal Wright, Superintendent Johnson, Area Director Bonds, and Area Director Hutchinson, as agents of the District and the State of Idaho, had no legitimate governmental interest that outweighed giving Plaintiffs adequate procedural safeguards during the adjudication of the claims against them.

181. Principal Wright, Superintendent Johnson, Area Director Bonds, and Area Director Hutchinson oversaw these deprivations of due process and impliedly or expressly ratified them as the officials responsible for discipline of the Plaintiffs.

182. Principal Wright, Superintendent Johnson, Area Director Bonds, and Area Director Hutchinson had the authority to rectify the due process deficiencies in this case. They chose not to do so.

183. This deficiency to the disciplinary process cannot be cured because the District held the hearings without providing the requested safeguards, resulting in a process by which Plaintiffs are unable to obtain a fair hearing.

184. Plaintiffs have been irreparably harmed by Defendants' violation.

185. Plaintiffs seek declaratory and prospective injunctive relief, expungement of sanctions and entries attributable to the violation, compensatory damages for injury proven to have resulted from that violation, and nominal damages where appropriate.

**COUNT IV — SUBSTANTIVE DUE PROCESS**
**ARBITRARY AND CAPRICIOUS INTERPRETATION OF POLICIES**
**42 U.S.C. § 1983**
**(IN THE ALTERNATIVE)**
**DEFENDANTS WRIGHT, JOHNSON, HUTCHISON, AND BONDS**

186. Plaintiffs incorporate the preceding paragraphs, herein.

187. Plaintiffs had a protected property interest in continued public education. Acting under color of state law, Principal Wright, Superintendent Johnson, and Area Director Bonds, and Area Director Hutchison personally caused District policies to be interpreted in an arbitrary and capricious manner as they related to Plaintiffs' discipline.

188. Plaintiffs have a liberty interest in their reputations and future opportunities that they will be deprived of by having disciplinary actions on their student records that might need to be disclosed to universities, employers, and others.

189. The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

190. Defendants lack immunity for violating Plaintiffs' rights under the Fourteenth Amendment to the U.S. Constitution.

191. Substantive due process prohibits executive action that deprives a person of life, liberty, or property in a manner sufficiently egregious to shock the conscience. *Corales v. Bennett*, 567 F.3d 554 (9th Cir. 2009).

192. Defendants violated Plaintiffs' rights of substantive due process in that the challenged disciplinary actions were done pursuant to Defendants' own arbitrary and capricious interpretation of the District's policies and/or were ratified by Defendants.

193. This was demonstrated by:

a. Superintendent Johnson, Principal Wright, Area Director Bonds and other District officials' repeated public assurances of accountability and punishment before Plaintiffs had been heard;

b. Principal Wright's false assertion in Plaintiffs' October 6 suspension letters that Plaintiffs were "informed of the reasons for the proposed suspension and provided an informal opportunity to challenge those reasons and provide an explanation before the suspension was imposed";

c. Area Director Bonds's false assertion in Plaintiffs' October 13 suspension letters that "Consistent with applicable due-process requirements, [Plaintiffs] w[ere] provided notice of the reasons for the suspension and an opportunity to respond to and challenge those reasons";

d. The Plaintiffs' successive exclusions totaling seventeen school days, without a meaningful opportunity to be heard and in excess of the 15 days of suspension permitted by Idaho Code §33-205;

e. Plaintiffs' completed threat assessments noting a "Transient" threat for each of them, yet Principal Wright recommended removal from Timberline and a change in school placement for them;

f. The conditioning of adequate preparation time for the placement hearing for JD1 and JD2 on accepting temporary tutoring and remaining excluded from Timberline even after their suspensions expired;

g. Reliance on the "Impact on Timberline" statement that was unsigned, undated, and failed to differentiate each Plaintiffs' conduct and its associated impact; and

h. The subsequent imposition of semester-long or year-long exclusion from Timberline.

194. The challenged use of disciplinary authority was a deliberate means of imposing substantial educational restrictions to appease the public and satisfy the promises of punishment made prior to Plaintiffs having an opportunity to be heard, without a legitimate basis for the particular duration and scope of each restriction. Treating the aggregated reactions as grounds for prolonged disciplinary exclusion, substituted collective blame and public pressure for an individualized educational justification.

195. Plaintiffs have been irreparably harmed by Defendants' violation.

196. Plaintiffs seek declaratory and prospective injunctive relief, expungement of sanctions and entries attributable to the violation, compensatory damages for injury proven to have resulted from that violation, and nominal damages where appropriate.

**COUNT V — FIRST AMENDMENT RETALIATION**
**42 U.S.C. § 1983**
**[ALL DEFENDANTS]**

197. Plaintiffs incorporate the preceding paragraphs, herein.

198. Defendants acted under color of state law in exercising public-school disciplinary authority. Principal Wright, Superintendent Johnson, Deputy Intendent Smith, Area Director Bonds and Area Director Hutchinson personally caused the challenged disciplinary actions due to Plaintiffs' exercise of free speech.

199. Plaintiffs engaged in speech protected by the First Amendment relating to the Snapchat conversation.

200. Plaintiffs' constitutionally protected, off campus, after hours, speech did not constitute serious or severe bullying or harassment, a constitutionally unprotected threat, or an invasion of another student's rights that would foreseeably reach school or Jane Moe sufficient to justify the challenged discipline.

201. The Snapchat messages, while a crude and distasteful exchange, when viewed in context of the conversation, were merely a criticism of James Poe's relationship with Jane Moe, rather than a serious expression of an intent to commit violence by any of the Plaintiffs against Jane Moe.

202. Defendants subjected Plaintiffs to discipline including a seventeen-day exclusion as well as school relocation orders.

203. The suspensions and compulsory removal from Timberline and change of school location, together with the resulting disciplinary-record consequences, would deter a student of ordinary firmness from engaging in comparable protected expression.

204. The discipline imposed on Plaintiffs was because of Plaintiffs' exercise of their First Amendment rights, with Plaintiffs' statements cited as the basis for their discipline.

205. The discipline imposed on Plaintiffs was based on disapproval of, and the reaction to, their speech and the demands of an angry public.

206. The retaliation against Plaintiffs has caused them the loss of in-person educational access during the duration of their suspensions, through the end of the semester for JD2 and JD3, and through the end of the year for JD1. JD4's extent of exclusion and duration are still awaiting determination.

207. Plaintiffs have been irreparably harmed by Defendants' violation.

208. Plaintiffs seek declaratory and prospective injunctive relief, expungement of sanctions and entries attributable to the First Amendment violation, compensatory damages for injury proven to have resulted from that violation, and nominal damages where appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request:

209. A declaration, to the extent appropriate to resolve an ongoing controversy, that the challenged disciplinary exclusions deprived Plaintiff of procedural due process.

210. Preliminary and permanent injunctive relief against the Defendants ending any continuing exclusion imposed without sufficient process and restoring educational access pending a lawful determination, subject to constitutionally permissible individualized safety measures.

211. An order requiring the District to expunge the specifically identified sanctions and adverse disciplinary entries resulting from the unconstitutional process. Litigation-preservation materials may be retained separately without continued adverse disciplinary use.

212. Compensatory damages against each liable Defendant for injury proven at trial to have been caused by the constitutional violation.

213. Nominal damages if appropriate upon proof of a constitutional violation.

214. Reasonable attorney's fees and allowable costs under 42 U.S.C. § 1988 and Fed.R.Civ.P. 54.

215. Such other relief as the Court determines just and proper.

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

_*/s/ Jeremiah Hudson*_____________
Jeremiah Hudson
*Attorney for JOHN DOE #1*

_*/s/ Will Young*________________
Will Young
*Attorney for JOHN DOE #2*

_*/s/ Dean Sorensen*______________
Dean Sorensen
*Attorney for JOHN DOE #3*

_*/s/ Michael Bartlett*____________
Michael Bartlett
*Attorney for JOHN DOE #4*