Jeremiah M. Hudson, ISB No. 8364
Jennifer Hanway, ISB No. 9921
FISHER & HUDSON, PLLC
1109 W. Main St., Ste. 600
Boise, ID 83702
Telephone: (208) 345-7000
Facsimile: (208) 514-1900
jeremiah@fisherhudson.com
service@fisherhudson.com

Attorneys for Plaintiff John Doe #1

William Young, ISB No. 9415
Schofield and Young PLLC
1109 W. Main Street, Suite 600
Boise, ID 83702
E-file: e-file@youridattorney.com
William@youridattorney.com
Telephone: (208) 344-0128

Attorneys for Plaintiff John Doe #2

Dean C. Sorensen, ISB No. 5931
SORENSEN LAW, PLLC
401 West Front Street, Suite 302
Boise, Idaho 83702-5122
Telephone: (208) 922-6972
sorensen@cssklaw.com

Attorneys for Plaintiff John Doe #3

Michael Bartlett, ISB No. 5496
BARTLETT LAW PLLC
1002 W. Franklin St.
Boise, Idaho 83702
Telephone: (208) 629-2311
Facsimile: (208) 629-2460
michael@bartlettdefense.com

Attorneys for Plaintiff Jane Roe/John Doe #4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN DOE #1, JOHN DOE #2, JOHN DOE #3, JANE ROE on behalf of her minor child, JOHN DOE #4,<br><br>Plaintiffs,<br><br>v.<br><br>WENDY JOHNSON, in her individual capacity, NICK SMITH, in his individual capacity, CHAD WRIGHT, in his individual capacity, and SHELLEY BONDS, in her individual capacity, JASON HUTCHINSON, in his individual capacity,<br><br>Defendants. | Case No.: 1:26-cv-00752<br><br>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

# I. INTRODUCTION

Plaintiffs John Doe #1 ("JD1"), John Doe #2 ("JD2"), John Doe #3 ("JD3"), and John Doe #4 ("JD4") seek an order (1) reversing the challenged disciplinary removal decisions and restoring them to Timberline High School, and (2) expunging the student disciplinary records resulting from the challenged suspensions and removal proceedings. This motion rests on Fourteenth Amendment procedural due process and the First Amendment of the United States Constitution. Plaintiffs do not ask the Court to approve their private language. They ask the Court to enforce the constitutional requirement that public officials hear students before punishing them and adjudicate disputed misconduct through a fair process and without infringement on their off-campus speech.

Four defects require relief. First, the District imposed and repeatedly extended Plaintiffs' suspensions without giving them any prior opportunity to answer the charges. Second, while Plaintiffs remained excluded from school and before their removal hearings, District leadership publicly and repeatedly condemned Plaintiffs' alleged conduct and committed the District to punishing Plaintiffs—foreclosing an unbiased determination by subordinates who would have had to reject the public conclusions of their institutional superiors. Third, and alternatively, the removal procedures denied Plaintiffs a meaningful opportunity to prepare and present a defense. Fourth, the District found that Plaintiffs caused the disruption that followed the publication of their private, off-campus speech in violation of their First Amendment rights.

# II. FACTUAL BACKGROUND

## A. A PRIVATE CONVERSATION WAS PUBLISHED, AND PUBLIC OUTRAGE FOLLOWED

All four Plaintiffs attended Timberline High School ("Timberline") and played on the football team before the challenged discipline. JD1, JD2, JD3, and JD4 are seniors. JD1 Decl. ¶2; JD2 Decl. ¶2; JD3 Decl. ¶4; Jane Roe Decl. ¶2. The controversy began with a private Snapchat

group chat called "Gameday lunch." *See e.g.* Hudson Decl. Ex. A (p. 46). In its later threat assessment, the District described the exchange, which occurred outside school hours on Wednesday, September 30, 2026, as one that "turned from the discussion of what to have for their group lunch to trying to support their friend/fellow teammate in what they viewed as an unhealthy relationship." Hudson Decl. Ex. A (p. 46). The messages to their teammate, who plaintiffs refer to as James Poe ("Poe"), concerned his girlfriend, referred to hereafter as Jane Moe because she is a minor. *See e.g.* Hudson Decl. Ex. A (p. 46-47); JD1 Decl. ¶¶9-13. Plaintiffs never intended for Jane Moe to see their private messages with Poe, or for anyone to disseminate those messages publicly. JD1 Decl. ¶6; JD2 Decl. ¶5; JD3 Decl. ¶7; Hudson Decl. Ex. A. (pp. 46-47.)

School Psychologist Katie Cronin's interview notes record Poe's explanation for Plaintiffs' messages: "The kids were trying to—they thought she wasn't the greatest role model for me and they were trying to support me." Hudson Decl. Ex. A. (p. 46.) The notes also record his account of mistreatment after a breakup, including fake social media accounts, AI-generated images, and calls or messages to him and his mother accusing Poe and another girl of having STDs. *Id.*

Beyond what Cronin's notes reflect, Poe had told Plaintiffs that Jane Moe had been severely harassing him: she told him and another girl he was dating to kill themselves, vandalized his property, and propositioned his friends to engage in sexual activity. *See e.g.* JD1 Decl. ¶5; JD2 Decl. ¶6; JD3 Decl. ¶8; Hudson Decl. Ex. A. (pp. 46). Plaintiffs and other teammates had previously voiced their concerns to Poe and believed they may have convinced him to end the relationship with Jane Moe permanently. JD1 Decl. ¶7; JD2 Decl. ¶7; JD3 Decl. ¶8. On the evening of September 30, however, Plaintiffs learned Poe had met with Jane Moe earlier that day. JD1 Decl. ¶8; JD2 Decl. ¶8; JD3 Decl. ¶9; Hudson Decl. Ex. A. (p. 46.). On October 1, Jane Moe

took screenshots from Poe's phone of the private group chat, sent them to a local Instagram account, and she posted them to TikTok. *See* Hudson Decl. Ex. A. (p. 47-48.).

Cronin's threat assessment notes state that Poe "does not think his friends really meant anything they said about hurting her, raping, or killing." They describe "a private group chat" Poe's girlfriend "was not supposed to see." *Id.* (p. 47.). When Cronin asked Jane Moe why she thought Plaintiffs sent the messages to her boyfriend, she answered "because they don't like her and didn't like that they got back together" and "[h]is friends thought she mistreated him." *Id.* (p. 48). Cronin's report states Jane Moe "wants to see [Plaintiffs] suspended for 15 days." *Id.* (p. 49).

Plaintiffs do not minimize the language in the messages, but they deny any implication the messages referred to sexual assault or real threats of violence or were meant to intimidate, threaten, or harass Jane Moe or anyone else. JD1 Decl. ¶9; JD2 Decl. ¶9; JD3 Decl. ¶11. They intended the messages to be a private conversation with Poe to convince him to break up with Jane Moe and to provoke a reaction from him through crude statements about how others perceived her and how his life would be easier if they broke up after Poe rekindled his relationship with Jane Moe. JD1 Decl. ¶9; JD2 Decl. ¶9; JD3 Decl. ¶11.

In early October, Jane Moe and others posted selected screenshots on social media, omitting the initial messages that explained the context of the conversation, and the screenshots immediately went viral. *See e.g.* Hudson Decl. Ex. A (pp. 41-42); JD1 Decl. ¶13, and Ex. A. Media coverage was intense. It included characterizations such as "Timberline High School class walk out after violent threats made to female student"; references to "Snapchat messages involving Timberline football players that called for a female student to be raped and killed"; and descriptions of the "attention — and fury — from the broader community" over "members of the Timberline football team sending violent messages on Snapchat about raping and killing a female

student," among many others. *See* Hudson Decl. Ex. B. A Change.org petition dated October 3, 2026, titled "Demand justice and accountability at Timberline High School," demanded the students' immediate removal from the football team and expulsion from Timberline; it now has more than 15,000 signatures. Hudson Decl. Ex. C. Timberline students held a protest and walked out of class. *See* Young Decl. Ex. I. An Instagram account, "thswalkout2026," announced the October 7 walkout as "protesting on how ths has not done ANY consequences to [JD1, JD3, JD4, and JD2]." Jane Roe Decl. ¶5, Ex. H.

## B. <u>**IMMEDIATE AND SUCCESSIVE SUSPENSIONS FROM SCHOOL**</u>

District officials suspended Plaintiffs immediately for two school days, then extended the suspensions by five school days and again by ten school days, for a total of seventeen school days, without ever giving Plaintiffs a prior opportunity to answer the charges. The suspensions began on Monday, October 5, and ended on Thursday, October 29. Declarations of JD1 ¶¶18-19, Ex. B; JD2 ¶¶11-16; JD3 ¶¶20-26; Jane Roe ¶¶9-10, 27, Ex. K, Q.

Principal Wright sent letters on Tuesday, October 6, 2026 (mistakenly dated October 26), that imposed a five-school-day suspension from October 7 through October 14, and attributed the suspension to Plaintiffs' individual messages because they "raise serious concerns regarding student safety and welfare and have caused or contributed to substantial disruption of the school environment." Declarations of JD1 Ex. B; JD2 Ex. A; JD3 ¶¶22-24; Jane Roe Ex. K. The letters characterized the exclusion as "a school disciplinary action," declared the suspensions "warranted," and prohibited each Plaintiff from entering District property or participating in District-sponsored activities. *Id.* On Tuesday, October 13, Area Director Bonds extended the suspensions by ten additional school days, from October 15 through October 29. Decls. of JD1 Ex. C; JD2 Ex.B; JD3 ¶25; Jane Roe Ex. Q. She described the extension as "a continuation of the temporary suspension," copied the "Student Discipline File," and, in her accompanying email,

explained the District had extended the suspension "as our district team continues to investigate." *Id*. Plaintiffs had not been asked by any District officials to provide a response to the allegations against them before those suspensions were imposed despite both suspension letters indicating that they had. Decls. of JD1 ¶¶18-19; JD2 ¶¶15-16; JD3 ¶20-21, 26; Jane Roe ¶¶9-10.

### C. <u>THE DISTRICT LEADERSHIP PUBLICLY COMMITTED TO PUNISHMENT BEFORE GIVING PLAINTIFFS AN OPPORTUNITY TO BE HEARD</u>

On Saturday, October 3, the District Administration told families it had received reports of "highly inappropriate and concerning social media posts." Hudson Decl. Ex. A (p. 55). Also, Timberline football coach Ian Smart posted to the team's SportsYou app: "As I'm sure all are aware, some of our players made disgraceful comments about another student. At this time, I am working with our school administration to determine what the consequences for these student's actions will be moving forward." Jane Roe Decl. ¶8, Ex. J.

On Sunday, October 4, Principal Wright, Area Director Bonds, and Superintendent Johnson sent a message to families and staff describing "disturbing social media posts" and declaring "zero tolerance for the type of behavior and language attributed to any member of our school community." The officials continued: "This is not who we are and we will not be defined by the actions of a few." Hudson Decl. Ex. A (pp. 58–59.). On Tuesday, October 6, the same officials announced the postponement of Timberline's homecoming activities, including the football game. *Id*. (pp. 60-62). They pointed to "heightened emotions" and "threats of violence." *Id*. The later cancellation notice cited "ongoing concerns about student safety and well-being." *Id*.

On October 9, the Principal, Area Director, and Superintendent described Jane Moe as "the target of the disturbing threats of violence that brought us to this point." *Id*. (pp. 63-65). The statement announced: "While the individuals will be held accountable for their actions, the decision to cancel was not a disciplinary action against the Timberline football team." *Id*. They

referred to Plaintiffs when describing "[t]he actions and poor choices of individual students" and repeated, "Accountability matters, and those processes will continue." *Id*. The same statement acknowledged "negative, threatening, and highly emotional thoughts expressed throughout the community either on social media, local and national media, as well as messages and phone calls to school and district staff." *Id*.

At the District Board of Trustees' meeting on October 12, Area Director Bonds described the messages as "incredibly horrific." *Id*. Ex. E. According to media reports, she said police interviews had concluded the preceding Wednesday, October 7, and the District had been "given the all clear to begin investigating on our own." *Id*. Ex. F. At the meeting, Trustees praised school and District officials, thanked those circulating the private chat, praised the student protesters, and implicitly condemned Plaintiffs. *See Id*. Ex. E.

On October 13, all seven Trustees, Superintendent Johnson, and Deputy Superintendent Nick Smith signed an open letter to the public. *Id*. Ex. F. They described "a private string of vulgar and violent text messages," "a highly public and horrific situation," and "the anger, callousness, and lack of respect for another human being conveyed in the online messages." *Id*. The Trustees acknowledged, "we must remain at some distance to avoid conflicts with our role in adjudicating student disciplinary actions," yet went on to declare: "Those responsible are being investigated and disciplined." *Id*. They told the public: "The process, although not as quickly or as ruthlessly as some on social media would like, is working." *Id*.

District leadership's public endorsement of guilt and promise of accountability, coupled with the policy requirement that warranted discipline be "reasonable and proportionate to the nature and severity of the behavior," signaled the punishment would track the officials' public characterization of the conduct. *Id*. Ex. A (p. 12). Meanwhile, Jane Moe taunted Plaintiffs on social

media. One post shows a picture of her winking, captioned "sorry i ruined ur life it's how i cope with my problems." Another showed Jane Moe and a friend smiling at the camera, captioned "us after getting half a football team expelled and benched." Young Decl. Ex. J.

## D. THE PROPOSED REMOVALS

Between October 21 - 22, 2026, Principal Wright sent Plaintiffs letters recommending their removal from Timberline and placement at either the Boise Alternative to Suspension and Expulsion school or Boise Online School for either the remainder of the semester or school year. Hudson Decl. Ex. A, (pp 2-3); Young Decl. Ex. D; JD3 Decl. Ex. F (p. 1); Jane Roe Decl. Ex. AA. The letters stated the removals would be "in addition to the temporary suspension." *Id.* The notices attributed specific group-chat statements to each Plaintiff, asserted "[t]his also led to school disruption," and cited "Violation of Policies 3230, 3272, 3273 and 3275" as the grounds. *Id.* The notices promised a hearing within five school days and advised Plaintiffs of their rights to counsel, to present witnesses and evidence, and to cross-examine adult witnesses. *Id.* But they provided: "The hearing packet will be shared with you 24 hours prior to the hearing." *Id.* The hearing panel would consist of a nonvoting hearing chair, two administrators, and a counselor—all District employees. *Id.*; *see also* Hudson Decl. Ex. A, (pp. 5). Policy 3273 allows appeals to the Council of Directors, which consists of the District's four Area Directors, and then to the Board of Trustees. *Id.* The District's employee panelists were subordinate to the Superintendent and Trustees, whose public statements they had received. *Id.* Ex A (5-6, 55-68); *Id.* Ex. F.

Plaintiffs received the hearing packets on the afternoon of Friday, October 23. The District scheduled JD3's and JD4's removal hearings for Monday, October 26, and JD2's and JD1's for Tuesday, October 27. Hudson Decl. ¶2, Ex. A; Young Decl. ¶¶6-7, Ex. E; JD3 Decl. ¶¶ 28–29, Ex. G; Jane Roe Decl. ¶¶22-23, Ex. BB-CC. The hearing packets included the District's completed threat assessments, which classified each Plaintiff as "Transient," rather than "Serious

Substantive" or "Very Serious Substantive." JD2's, JD1's, and JD3's panels all found they had no intent to carry out violence. Hudson Decl. Ex. D; Young Decl. Ex. I; JD3 Decl. Ex. I.

The hearing packets also contained an undated, unsigned "Impact on Timberline" statement. *See e.g.* Hudson Decl. Ex. A (p. 68). It asserted some screenshots "referenced sexual violence" while others included "AI generated pornography, death and killing." *Id*. The statement listed police support, crisis and counseling resources, staff demands, hundreds of messages, seven District communications, "96 more absences during that week compared to the previous week," and cancelled or postponed homecoming events. *Id*. It concluded: "This has had a huge impact on our school community, that we have yet to recover from." *Id.*

JD3 attended his removal hearing on October 26, with his parents and attorney. JD3 Decl. Ex. H. JD1 and JD2 objected to their original hearing dates because they left them insufficient time to strategize, prepare, or gather witnesses for a hearing with significant consequences for their liberty interests, including the stigma of potential placement in a school called "Boise Alternative to Suspension and Expulsion." *See* Hudson Decl. ¶8; Young Decl. ¶7. JD4 requested more time to prepare, and the District reset his hearing for November 3. Jane Roe Decl. ¶23. The District agreed to move JD2's hearing to November 4 and told JD1 it would need to hold his hearing before November 5. Young Decl. ¶¶7-8, Ex. F, Hudson Decl. Ex. I. But Plaintiffs' suspensions were set to end on October 29. JD1 Decl. Ex. C; JD1 Decl. Ex. B; JD3 Decl. ¶25; Jane Roe Decl. Ex. Q. Plaintiffs therefore expected either to return to Timberline on October 30, or to have the Board of Trustees extend their suspensions by five additional days if a student's return "would be detrimental to other students' health, welfare, or safety." *See Id.*; Hudson Decl. Ex. A (pp. 4-7).

On Tuesday, October 27, the District's counsel, James Stoll, wrote that the District would not seek another five-day suspension. Hudson Decl. Ex. G. He instead offered Plaintiffs temporary

homebound instruction while they technically remained enrolled in their Timberline classes through their removal hearings. *Id.* His email explained: "The arrangement would be voluntary and temporary. It would not constitute another suspension or an implementation of the principal's recommended change of school location." *Id.* JD4 received the same offer from Area Director Bonds and accepted it pending his removal hearing. Jane Roe Decl. ¶24, Exs. DD–EE. Bonds confirmed the arrangement on October 29, and the District canceled JD4's November 3 hearing. Jane Roe Decl. ¶¶24-25. JD2 and JD1 declined the offer and indicated that they would return to school on October 30, after their suspensions ended. Hudson Decl. ¶10; Young Decl. ¶10.

At 6:55 p.m. on Wednesday, October 28, Stoll sent notices setting JD1's and JD2's hearings for 8:00 a.m. and 8:30 a.m., respectively, on Friday, October 30. Hudson Decl. Ex. H; Young Decl. Ex. H. The notices allotted 90 minutes for each hearing despite JD2's hearing being set to begin only 30 minutes after JD1's start time. *Id.* Stoll also advised JD2's attorney that Principal Wright, who had recommended the removals, would be out of town and unavailable for questioning. Young Decl. ¶13. He later explained the District had originally intended to give JD1 and JD2 until November 5 because it believed the Board of Trustees would extend Plaintiffs' suspensions to prevent their return before the hearings. *See* Hudson Decl. Ex. I. When JD1 and JD2 refused to give up their right to return to Timberline voluntarily, the District set their hearings for early on the very morning they were permitted to return. *See* Hudson Decl. Ex. H; Young Decl. Ex. H. JD1 and JD2 objected and did not attend the hearings because they lacked time to adequately prepare, and it was obvious the District was attempting to legitimize a predetermined removal of Plaintiffs from Timberline. *See* Hudson Decl. ¶12, 14, Ex. I; Young Decl. ¶14. Their hearings proceeded on October 30, without them. Hudson Decl. Ex. D; Young Decl. Ex. I.

JD1 and JD2 returned to Timberline on Friday, October 30, after serving 17 school days of suspension. Under their daily schedules, their school day began with third-period class at about 9:50 a.m. JD1 Decl. ¶20; JD2 Decl. ¶17. Near the end of that class, Timberline Vice Principal DJ Eberlin called JD1 and JD2 to the office and confiscated their phones, and then told them that they had been removed from Timberline.[1] *Id.* at ¶21 and ¶18.

## E. INDIVIDUAL DECISIONS AND DISCIPLINARY RECORDS

JD3's voting panel consisted of two District Principals and a Counselor. JD3 Decl. Ex. H. In a decision issued Thursday, October 29, four days after JD3's hearing, the panel found JD3's "off-campus Snapchat group conversation" caused "the disruption to the Timberline school community arising after the conversation became known." *Id.* It ordered JD3 to be placed in Boise Online School through at least the end of the semester. *Id.*

A District Principal, Assistant Principal, and a Counselor sat as JD1's voting panel. Hudson Decl. Ex. D. Hearing Officer Jason Hutchinson served as a nonvoting member.[2] *Id.* Ex. A (p. 2). The panel ordered JD1's removal from Timberline and placement at Boise Online School through the end of the 2026–2027 school year. The panel acknowledged "[t]he exchange occurred privately, outside school hours, and was not shown to have been intended for delivery to the targeted student or the broader school community," and found no plan for violence, yet concluded "[h]is statements were a material contributing cause of the disruption […]." Hudson Decl. Ex. D.

---

[1] When they asked why, VP Eberlin responded: "So, I'm at school, you're at school, I'm your custodian parent, and if I ask for your phone, then you give it to me or you're not compliant." *See* JD1 Decl. Ex. D. Eberlin then went into his office, shut the door, and called JD1 and JD2 "fucking assholes," stated "hey, both of them are here" to someone on the phone, who responded "ok, we'll call you back" and then hung up. *Id.* On information and belief, Eberlin was waiting to hear confirmation from the panel chair that JD1 and JD2 had officially been excluded from Timberline.

[2] Jason Hutchinson is one of the District's four Area Directors and would sit on the Council of Directors in an appeal under District Policy 3273. *See* Hudson Decl. Ex. A (p. 5).

JD2's panel included two District Principals and a Counselor, with Hearing Officer Hutchinson again serving without a vote. Young Decl. Ex. I. The panel recognized JD2's favorable threat assessment and the absence of any individualized fear of JD2, but found his words materially contributed to protest activity and operational disruption, specifically citing protesters who had signs quoting JD2. *Id.* It placed JD2 in Boise Online School through Semester 1, with a potential return to Timberline upon academic completion. *Id.*

## III. PRELIMINARY-INJUNCTION STANDARD AND PROTECTED INTERESTS

A plaintiff seeking a preliminary injunction must establish (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is an extraordinary remedy, never awarded as of right, and requires a clear showing the plaintiff is entitled to relief. *Id.* at 22, 24. The Supreme Court has held no further showing of irreparable harm is necessary where the deprivation of constitutional rights is at issue. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).

When a requested injunction requires affirmative action rather than preservation of the status quo, the Ninth Circuit applies a heightened standard for mandatory preliminary relief. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Plaintiffs are requesting the status quo.

## IV. FIRST: THE DISTRICT SUSPENDED PLAINTIFFS WITHOUT DUE PROCESS

"The Fourteenth Amendment forbids the State to deprive any person of life, liberty, or property without due process of law." *Goss v. Lopez*, 419 U.S. 565, 572-73 (1975).

### A. LIBERTY AND PROPERTY INTERESTS

"'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the [Due Process] Clause must be satisfied." *Goss*, 419 U.S. at 574 (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)).

As the *Goss* Court explained, sustained and recorded misconduct charges "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment," giving rise to a liberty interest protected by the Fourteenth Amendment. *Id.* at 575. The same is true of any disciplinary removal of Plaintiffs from Timberline to the Boise Alternative to Suspension and Expulsion or Boise Online School.

Plaintiffs also hold a state-created property interest in continued public education because Idaho extends public-school services to eligible residents between five and twenty-one years of age. Idaho Code § 33-201. Because Plaintiffs are eligible public-school students, the District cannot deprive them of that entitlement through disciplinary suspension without the minimum procedures the Fourteenth Amendment requires. *Goss*, 419 U.S. at 574, 581–82.

### B. THE PROCESS DUE

In *Goss*, the Supreme Court established the procedural due process requirements for K-12 students facing the loss of liberty or property interests through school discipline: a student facing a short suspension must receive "oral or written notice of the charges against him" and, if he denies the charges, "an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581; *see also K.J. v. Jackson*, 127 F.4th 1239 (9th Cir. 2025). "[A]s a general rule notice and hearing should precede removal of the student from school." *Goss*, 419 U.S. at 582. *Goss* permits immediate removal of a student who poses "a continuing danger to persons or property or an ongoing threat of disrupting the academic process," but "the necessary notice and rudimentary hearing should follow as soon as practicable." *Id.* at 582–83.

Here, the District denied Plaintiffs this basic exchange throughout their 17-school-day suspensions. At no point did the District ask Plaintiffs whether they denied the allegations, invite them to explain their version of events, or allow them to dispute the sanctions imposed. JD1 Decl. ¶¶ 18–19; JD2 Decl. ¶¶ 15–16; JD3 Decl. ¶ 26; Roe Decl. ¶ 10. Principal Wright's suspension

letters stated: "This suspension is a school disciplinary action based upon the information presently available to the District." JD1 Decl. Ex. B; JD2 Decl. Ex. A; JD3 Decl. ¶ 24; Roe Decl. Ex. K.

Plaintiffs satisfy each element for a preliminary injunction. First, Plaintiffs are likely to succeed on the merits: the District plainly violated their Fourteenth Amendment due process rights, as set forth above. Second, although Plaintiffs need not make a further showing of irreparable harm, *see Elrod*, 427 U.S. at 373, the District's unconstitutional discipline jeopardizes their access to educational and employment opportunities. JD1 Decl. ¶ 22; JD2 Decl. ¶ 19; JD3 Decl. ¶¶ 27–28; Jane Roe Decl. ¶ 28. Third, the balance of equities favors Plaintiffs because their interest in student conduct records free of unconstitutionally imposed discipline significantly outweighs the District's interest in maintaining those records. Finally, preventing constitutional violations is always in the public interest. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). This analysis applies equally to all of Plaintiffs' claims for preliminary injunctive relief, set forth below.

For these reasons, Plaintiffs ask the Court to order the District to immediately remove all disciplinary suspensions, and any reference to them, from Plaintiffs' student records.

## V. <u>SECOND: THE DISTRICT'S PUBLIC PREJUDGMENT DENIED PLAINTIFFS AN IMPARTIAL HEARING</u>

A hearing must be more than permission to speak after the institution has announced its conclusion. *Withrow v. Larkin*, 421 U.S. 35, 57–58 (1975). Due process requires a fair hearing before an impartial tribunal, and courts ask whether an adjudicator "has prejudged, or reasonably appears to have prejudged, an issue." *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995). Either actual bias or circumstances creating constitutionally disqualifying partiality can deprive a party of an impartial tribunal. *Id.* Adjudicators enjoy a presumption of honesty and integrity, and combining investigative and adjudicative functions does not, by itself, violate due process; but particular facts may establish a constitutionally intolerable probability of bias or unfairness.

*Withrow*, 421 U.S. at 46–47, 58. Public statements indicating a decisionmaker has already resolved a pending case differ materially from neutral announcements of suspected violations and may require disqualification for prejudgment. *Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 590–91 (D.C. Cir. 1970). In school disciplinary proceedings, a superintendent's involvement with the adjudicating body can undermine independent judgment and render the process fundamentally unfair. *Gonzales v. McEuen*, 435 F. Supp. 460, 464–65 (C.D. Cal. 1977).

This case presents an unusual but obvious claim of bias. The District's most senior officials, including Deputy Superintendent Smith, Superintendent Johnson, and each of the District's Trustees, publicly and repeatedly concluded Plaintiffs had engaged in severe disciplinary misconduct and promised the public "appropriate" punishment. Hudson Decl. Ex. A (pp. 55-69), Ex. F. This included statements from leadership describing "disturbing social media posts," announcing "zero tolerance for the type of behavior and language attributed to any member of our school community," and declaring, "This is not who we are and we will not be defined by the actions of a few." *Id.* (pp. 58-59). Leadership also characterized the messages as "disturbing threats of violence," referred to "[t]he actions and poor choices of individual students," and promised "the individuals will be held accountable for their actions." *Id.* (pp. 63-64). The Superintendent, Deputy Superintendent, and all of the Trustees publicly described the messages as "a private string of vulgar and violent text messages," "a highly public and horrific situation," and "the anger, callousness, and lack of respect for another human being conveyed in the online messages." *Id.* Ex. F. They declared, "Those responsible are being investigated and disciplined," while acknowledging the Board's "role in adjudicating student disciplinary actions." *Id.* The District's policies then assigned subordinate employees to decide, in Plaintiffs' removal hearings, whether their superiors' conclusions about Plaintiffs were wrong. *Id.* Ex. A (pp. 5-6).

These public declarations, distributed to the community and District employees,[3] placed significant pressure on subordinate panelists and appellate decision-makers to ratify the publicly announced conclusions of their superiors, or their own. *Id*. Ex. A (p. 4-8). The defect is not simply that District employees are judging Plaintiffs' conduct and may decide which sanctions, if any, are appropriate. *Id*. It is that District leadership's public predetermination that Plaintiffs had engaged in substantial misconduct and would be punished displaced the employees' independent consideration of Plaintiffs' conduct, defenses, and appropriate sanctions. *Id*. at (58-65), and Ex. F.

Substantial evidence also shows the District designed these removal hearings to carry out its predetermination of Plaintiffs' removal from Timberline. Under the panel hearing policy, a student receives a decision three days after the hearing. *Id*. Ex. A (p. 5). JD3 received his decision on that timeline after his Monday, October 26 hearing, which took place four days before his suspension expired. JD3 Decl. ¶¶25, 29–30, Exs. E, H. But when JD1 and JD2 declined the District's offer of homebound instruction and planned to return to Timberline on Friday, October 30, after their suspensions ended, the District abruptly moved their hearings, which it had scheduled or planned to schedule for the following week, to 8:00 and 8:30 a.m. on Friday, October 30. Hudson Decl. Ex. D; Young Decl. Ex. I. During JD1's 8:00 a.m. hearing, the panel chair, District Area Director Jason Hutchinson, who is supposed to be neutral, stated on the record the panel would remain to deliberate because it intended to issue an oral ruling on JD1's and JD2's removals after the hearing, rather than wait the typical three days for a written decision. Hudson Decl. Ex. J. The District cannot explain why it was willing to give Plaintiffs more time to prepare only until it became clear they would return to school before their removal hearing, or why it

[3] Most of the statements were actually provided to the hearing panel members in Plaintiffs' hearing packets. *See* Hudson Decl. Ex. A (55-68).

needed to rush an oral decision, unless it had already decided to remove Plaintiffs from Timberline. *See Id*. Nor is it clear why a neutral panel would accept last-minute changes to its hearing schedule at the District's requests knowing about Plaintiffs' objections for inadequate preparation time.

No panel or appeal body can fairly adjudicate these cases after District leadership repeatedly condemned Plaintiffs' alleged conduct and promised the public that Plaintiffs would be punished. *See* Hudson Decl. Ex. A (p. 55-68), Ex. F. Under District Policy 3273, every decision-maker at every stage of hearing or appeal is either (1) an employee subordinate to the District officials who publicly condemned Plaintiffs' alleged misconduct and promised the public and District employees that Plaintiffs would be disciplined, or (2) an official who condemned Plaintiffs' alleged misconduct. *Id*. Ex. A (pp. 5-6).

Plaintiffs therefore seek reversal and expungement of the panel decisions for JD2, JD1, and JD3, and an order preventing a hearing related to JD4, the reinstatement of Plaintiffs to Timberline, and the dismissal of any pending investigations relating to the alleged conduct.

## VI. THIRD, ALTERNATIVELY: THE REMOVAL PROCEDURES WERE FUNDAMENTALLY UNFAIR

Even if the Court finds the employee panels capable of impartiality, the particular procedures the District used denied Plaintiffs a meaningful opportunity to present a defense. Determining the required safeguards involves weighing the private interest affected, the risk of erroneous deprivation and the probable value of additional safeguards and the government's interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); see also *Black Coal. v. Portland Sch. Dist. No. 1*, 484 F.2d 1040, 1045 (9th Cir. 1973); *Dudley v. Boise State Univ.*, 152 F.4th 981 (9th Cir. 2025). Students' interests include continued public education and protection against sustained and recorded misconduct charges that may damage their standing with teachers and peers or interfere with future educational and employment opportunities. *Goss*, 419 U.S. at 574–76.

If the Court determines that Plaintiffs can have an impartial hearing with District employees, Plaintiffs seek safeguards tailored to reducing the risk of error, including adequate disclosure and preparation time, access to material adverse evidence, and a meaningful means of testing important adverse sources. Here, the District notified Plaintiffs of their hearings and produced its evidence only days before the scheduled hearings, leaving Plaintiffs insufficient time to prepare their defenses. *See* Hudson Decl. Ex. A; Young Decl. ¶¶ 6–8, 11–14; JD3 Decl. ¶¶ 28–29, Ex. G; Jane Roe Decl. ¶¶22-23 Exs. BB-CC.

**VII. <u>FIRST AMENDMENT RETALIATION</u>**

Public-school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969). To justify suppressing expression, school officials must demonstrate "something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," although expression that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others" is not constitutionally immune from regulation. *Id*. at 509, 513. For off-campus speech, "courts must be more skeptical of a school's efforts to regulate" because such regulation, combined with on-campus restrictions, encompasses "all the speech a student utters during the full 24-hour day." *Mahanoy Area School Dist. v. B. L.*, 594 U.S. 180, 189, 2046 (2021).

Nevertheless, "[t]he school's regulatory interests remain significant in some off-campus circumstances," including "serious or severe bullying or harassment targeting particular individuals" and "threats aimed at teachers or other students." *Id*. at 2046. The Ninth Circuit's sufficient-nexus inquiry considers "(1) the degree and likelihood of harm to the school caused or augured by the speech, (2) whether it was reasonably foreseeable that the speech would reach and

impact the school, and (3) the relation between the content and context of the speech and the school." *Chen Through Chen v. Albany Unified School Dist.*, 56 F.4th 708, 720 (9th Cir. 2022) (quotations omitted). Although "the mere fact that a student's off-campus communication finds its way to the school is not alone sufficient to warrant regulation by school officials," students have no "license to disseminate severely harassing invective targeted at particular classmates in a manner that is readily and foreseeably transmissible to those students." *Id.* at 722-23.

In *Chen*, the plaintiff posted social media messages to a private Instagram account with his thirteen friends where he made "a number of cruelly insulting posts about various AHS students"—ranging "from immature posts making fun of a student's braces, glasses, or weight to much more disturbing posts that targeted vicious invective with racist and violent themes against specific Black classmates." *Id.* at 711. While the Instagram account was intended to be private, the plaintiff's posts began spreading around at school and to those who had been targeted—including several African American students who reported being afraid to go to class, "devastated," "scared," and "bullied," and their grades suffered. *Id.* at 713-714. The Ninth Circuit held that the school did not violate the plaintiff's rights by expelling him because it was foreseeable that his posts would "ultimately hit their targets, with resulting significant impacts to those individual students and to the school as a whole." *Id.* at 720. The Court stated that once plaintiff's "posts hit their targets, the school was confronted with a situation in which a number of its students thereby became the subjects of 'serious or severe bullying or harassment targeting particular individuals'" for which "[t]he school's regulatory interests remain significant." *Id.* at 721-22.

There are a number of significant differences between *Chen* and this case. Here, the context of the speech is substantially different. Plaintiffs were directing their off-campus speech, which was almost exclusively about Jane Moe, for the purpose of convincing their friend, Poe, to take

certain actions with regards to Jane Moe—i.e. to break up with her. *See* Hudson Decl. Ex. A (pp. 46-47); JD1 Decl. ¶ 9; JD2 Decl. ¶ 9; JD3 Decl. ¶ 11. The purpose of the off-campus speech was not to bully, harass, or make fun of Jane Moe. *See Id*. In *Chen*, the plaintiff posted a substantial number of posts about multiple student targets and at least one employee over several months, and his purpose was certainly to bully, harass, and make fun of them to his followers. *See Chen*, 56 F.4th at 711-13. Here, the full message thread, as set forth in the District's threat assessment, clearly shows the context of Plaintiffs' conversation with their friend. Hudson Decl. Ex. A (pp. 41-42). Schools have interests in preventing their students from being bullied or harassed by other students; they have far fewer interests in policing private conversations between students about whether one of them should discontinue a romantic relationship with another student. *See Id.*

Second, the fact that several students were targeted in *Chen* over an extended period of time made it far more foreseeable that the plaintiff's Instagram posts—some of which prompted outrage from his followers—would be circulated. *See Chen*, 56 F.4th at 711-13. Here, this single private off-campus chat among teammates occurred on Snapchat, which results in the messages disappearing after a certain period of time—making it much less likely that the messages would be publicly circulated. *See e.g.* JD1 Decl. ¶10.

Lastly, the plaintiff's Instagram posts in *Chen* caused the harm to the targeted students when they were foreseeably circulated because the several students who were the targets of those posts felt bullied, harassed, and threatened by the plaintiff's posts about them. *Chen*, 56 F.4th at 711-13. Here, when Jane Moe was asked during her threat assessment interview why she believed Plaintiffs talked about her in their off-campus chat, District Psychologist Cronin wrote: "because they don't like her and didn't like that they got back together. His friends thought she mistreated him." Hudson Decl. Ex. A (p. 48). Jane Moe recognized that the context of the conversation was

not to bully, harass, or target her. *Id*. Cronin's interview with her boyfriend, Poe, states that he told Cronin that Jane Moe "was offended by the texts and she threatened to go public with them"—which she did the following morning. *Id*. (p. 47). Not only did plaintiffs not reasonably foresee Jane Moe seeing their private messages with their friend trying to convince him to break up with her—since usually people do not share their friends' criticisms of their relationship with their girlfriends or significant others—but it was certainly unforeseeable that Jane Moe would take a screenshot of the private messages and post them online without important contextual information. Even if that was somehow foreseeable, the viral nature and the public's reaction certainly was not. The District held Plaintiffs accountable for all of it. *See Id*. (pp. 50-70); *see also* Hudson Decl. Ex. D; Young Decl. Ex. I; JD3 Decl. Exs. H–I.

It is clear that the sufficient-nexus inquiry does not support the District's disciplinary actions against Plaintiffs. Accordingly, this Court should order the District to reverse all disciplinary sanctions against Plaintiffs that resulted from their protected off-campus speech.

## VIII. CONCLUSION

Plaintiffs request an order (1) reversing the identified disciplinary removal decisions entered against them and restoring them to Timberline High School, and (2) expunging the identified student disciplinary records resulting from the challenged suspensions and removal proceedings. The Court should grant the requested reversal and expungement to the extent established for each Plaintiff, with specific implementation deadlines and separate preservation of litigation evidence.

DATED this 6th day of November, 2026.

_/s/ *Jeremiah Hudson*____________
Jeremiah Hudson
*Attorney for JOHN DOE #1*

_/s/ *Will Young*_ _______________
Will Young
*Attorney for JOHN DOE #2*

_/s/ *Dean Sorensen*_____________
Dean Sorensen
*Attorney for JOHN DOE #3*

_/s/ *Michael Bartlett*_____________
Michael Bartlett
*Attorney for JOHN DOE #4*